NOT DESIGNATED FOR PUBLICATION

No. 124,487

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

EMMANUEL DAON,
*Appellee*,

and

MARIA K. STEWART,
*Appellant*.


MEMORANDUM OPINION


Appeal from Johnson District Court; JACQUELYN E. ROKUSEK, judge. Opinion filed August 12, 2022. Reversed and remanded with directions.

*Joseph W. Booth*, of Lenexa, for appellant.

*Preston A. Drobeck*, of Berkowitz, Cook, Gondring, Driskell & Drobeck, LLC, of Kansas City, Missouri, for appellee.

Before GARDNER, P.J., HILL and ISHERWOOD, JJ.


PER CURIAM: A divorced couple, Emmanuel Daon and Maria K. Stewart, disagree about the distribution of funds from two 529 education accounts they created to benefit their two sons. Stewart contends that money from the account for their older son, Alexander, should be distributed to him now that he has attained the age of majority and is attending college. Daon argues that he should retain the money as his own property and that he has sole discretion on how the money is to be spent. When the parties submitted

1

this question to the divorce court, it was concerned about turning over a large amount of money to a young man, and ruled for Daon. Stewart appeals.

This is a question of contract interpretation. We are not bound by the district court's ruling. Having considered the language creating the accounts, the context of the agreement, and the applicable law, we cannot agree with the district court. We will not add anything to their agreement, as the district court did. We hold that Stewart's interpretation is correct and reverse the district court.

*Daon and Stewart thoughtfully provided for their sons' education in their divorce settlement.*

Daon and Stewart were married in 2000. Their oldest son, Alexander, was born in 2002, and their second son was born in 2005. During the marriage, the couple opened 529 College Savings Plan accounts for their sons, which allow individuals to avoid taxes on monies saved in the accounts for their child's educational expenses. 26 U.S.C. § 529 (2018). Daon is the owner of Alexander's account.

In 2012, the parties separated and agreed on the division of their assets and responsibilities. The section of their agreement titled "529 EDUCATION ACCOUNTS" states:

> "Any § 529 or Uniform Gift to Minors Accounts existing for the benefit of the minor children are to be held in constructive trust for the children with Mother and Father distributing the funds as they agree to be in the children's best interests until such time as the funds belong to the children (i.e., Uniform Gifts to Minors Act accounts or reaching majority under the terms of the original conveyance).
>
> "Pursuant to the terms and restrictions of said 529 College Savings Plan, neither party shall be permitted to withdraw any funds from said accounts without the express written consent of the other party. If either party is granted permission to withdraw funds from

2

said accounts for any purpose other than that authorized under the terms and restrictions of the 529 College Savings Plan, i.e., personal use, said party shall bear 100% of the tax consequences of said withdrawal. If either party withdraws any funds from said Plans in violation of the terms and restrictions of said Plans or without the express written consent of the other party, they shall be liable to and reimburse the other party for one-half (50%) of the amount withdrawn and shall be solely liable for any tax consequences of any unauthorized withdrawal. Upon said party's failure to reimburse the other party for said funds let execution lie thereon."

Daon and Stewart divorced in April 2012. The court incorporated the terms of their agreement into the divorce decree. Thus, the terms of the agreement became the orders of the court.

In 2020, Alexander turned 18 and was admitted to the engineering program at Kansas State University. Kansas State estimated it would cost Alexander $27,870 each year to attend. In April 2021, Stewart, through counsel, asked Daon to "provide the most recent updated [529 account] statement for Alex so the parties can confer and decide how to handle the boy's upcoming expenses." Daon, also through counsel, said he was "uncomfortable" disbursing the funds because of Alexander's refusal to involve Daon in his college planning process. Daon's attorney recommended he and Alexander hire a mediator or therapist to resolve the communications issue. Daon eventually provided the latest 529 account statement to Stewart, which showed $96,098.48 in Alexander's account as of March 31, 2021.

*The parties return to court.*

Because Daon continued to refuse to disburse any funds, Stewart moved the divorce court to enforce the 529 account provision. She claimed their agreement required that the account's monies be released to Alexander, the designated beneficiary, when he turned 18. Her motion included an alternative prayer for relief: that the court order Daon

3

"to follow the intention of the constructive trust and guarantee payment on [Alexander's] behalf for reasonable college expenses" including tuition, housing, books, and "all relief the court may find equitable under the premises."

Daon responded, claiming their agreement did not contemplate giving the funds to Alexander when he turned 18 and that he retained discretion over disbursements from the 529 account.

The court ruled in Daon's favor. In doing so, the court offered this opinion about possible mismanagement by Alexander:

> "And although Alexander may be 18 years old and heading to college and be considered an adult for those purposes, obviously the parents are managing the funds because there could be serious financial consequences for mismanaging the funds. And the plain language of the [agreement] clearly sets forth that father shall continue to manage Alexander's funds for his benefit for college."

The court expressed a concern about turning over this money to a young man. But the court should have, instead, limited its concerns to the terms of the parties' agreement.

*Here are the rules that guide us.*

Our review of a court's interpretation and legal effect of a separation agreement is unlimited. See *Loscher v. Hudson*, 39 Kan. App. 2d 417, 426, 182 P.3d 25 (2008). Separation agreements are subject to the same rules of law that apply to all contracts. *Drummond v. Drummond*, 209 Kan. 86, 91, 495 P.2d 994 (1972). We interpret this separation agreement to carry out the intentions of the people who created it. *In re Marriage of Traster*, 301 Kan. 88, 105, 339 P.3d 778 (2014).

4

Since the goal of contract interpretation is to determine the parties' intent, we first look to the plain language that the parties agreed upon. If the contract is unambiguous, the plain meaning controls. *In re Marriage of Strieby*, 45 Kan. App. 2d 953, 961, 255 P.3d 34 (2011). Courts should only use canons of construction when the plain meaning of the words cannot resolve the issue. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). The law favors reasonable interpretations, so results that transform the agreement into an absurdity should be avoided. *Wichita Clinic v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946 (2008).

The parties do not dispute how their agreement operated before Alexander turned 18. Under the agreement, neither party could withdraw funds without the express written consent of the other party. Essentially, then, Daon and Stewart both had veto powers over withdrawals—even withdrawals to pay for Alexander's education.

But the parties disagree over the effect of the second half of the section's first sentence:  "distributing the funds as they agree to be in the children's best interests *until such time as the funds belong to the children* (i.e., Uniform Gifts to Minors Act accounts *or reaching majority under the terms of the original conveyance*)." (Emphasis added.)

Here is the dispute in short. Does this agreement mean, as Stewart says, that the funds in the account belong to the children once they reach the age of majority? Or, as Daon insists, does it mean that the money only goes to the children once each parent has decided to disburse it from the account?

*We do not read conditions into the contract that are not there.*

Not counting the attached exhibits and various schedules, the text of the parties' marital settlement agreement covers 11 pages. It carefully identifies the parties, their children, their property, and their debts and obligations. The agreement thoroughly

presents and explains the many details of the parties' division of marital assets and liabilities. It is a well-drafted document that considers all important legal details. The agreement is a clear expression of the parties' intent. If something is omitted from this agreement, we believe that it was meant to be omitted.

The portions of the agreement that deal with the 529 education accounts are found in two paragraphs in Exhibit A and two identical paragraphs in Exhibit B. Attached at the end of the agreement, Exhibit A is entitled "Property and Debts to Wife." Exhibit B is called "Property and Debts to Husband."

The essence of the agreement is contained in the first paragraph. For ease of reference, we repeat it here:

> "Any § 529 or Uniform Gift to Minors Accounts existing for the benefit of the minor children are to be held in constructive trust for the children with Mother and Father distributing the funds as they agree to be in the children's best interests until such time as the funds belong to the children (i.e., Uniform Gifts to Minors Act accounts or reaching majority under the terms of the original conveyance)."

This means the education accounts remain the joint property of Daon and Stewart until either the ownership is divested to their sons, or the funds are fully expended in accordance with their agreement.

This concept of joint ownership is reinforced by this language:  "[any accounts] existing for the benefit of the minor children are to be held in constructive trust for the children with Mother and Father distributing the funds as they agree to be in the children's best interests." In other words, the money is placed in trust for their sons and Daon and Stewart must agree on how to spend it to benefit their sons.

6

But there is express language limiting how long this joint ownership and responsibility is to last. By using the language, "until such time as the funds belong to the children . . . " the parties have expressed an intent to turn the ownership of these funds to their sons. The question then arises, when will this turnover occur?

The timing of the turnover is explained by the parenthetical phrase found at the end of the sentence:  "(i.e., Uniform Gifts to Minors Act accounts or reaching majority under the terms of the original conveyance)." Our interpretation of this phrase begins with a point on usage.

We refer to "i.e." It is the abbreviation for the Latin words, *id est*, translated into English as "that is." In Garner's Modern English Usage, Oxford University Press, 480 (4th ed. 2016) it states, "the abbreviation is best confined to lists, parenthetical matter, and citations rather than used in text." Indeed, the abbreviation is used here in a parenthetical phrase. Its use shows us that the parenthetical phrase is used to clarify the phrase preceding the parenthesis that says, "until such time as the funds belong to the children."

This means the parenthetical comment determines when the funds will belong to the children:  either as set by the Uniform Gifts to Minors Act or by reaching the age of majority under the terms of the original conveyance. We have no Minors Act gifts here, so we understand the phrase refers to each specific 529 account. We find no specific language setting a date on the conveyances, even though the parents could have set such a date.

The account could have been turned over to Alexander when he was 21, 25, 30, or older, if his parents so desired. But they did not say so. This is a carefully drafted agreement. If the parties had wanted to delay turning these funds over to their sons, they

could have said so. They did not and we will not revise the agreement as the district court did.

We interpret the contract to mean the money should be turned over to Alexander when he reaches the age of majority. According to K.S.A. 38-101, the age of majority is 18. These accounts were meant to be held in trust to benefit each son with joint control until the money was disbursed to each son upon attaining the age of majority.

We reverse the district court's contrary interpretation.

*We grant appellate attorney fees.*

Stewart has asked for an award of attorney fees under Supreme Court Rule 7.07 (2022 Kan. S. Ct. R. at 51). We grant her request. Several factors persuade us that an award is proper here. First, Stewart, even though she has prevailed, is not receiving anything for her efforts. The award of the account is to benefit her son. Second, there is a great disparity in the incomes of the two parties. Third, the parties' agreement provides for attorney fees. Finally, given the complexity of the issues and the time involved, the requested fee is reasonable.

We award Stewart $15,840 for her attorney fees on appeal, to be paid by Daon.

We reverse the district court's grant of judgment to Daon. We remand the case to the district court with directions to enter judgment to Stewart in conformity with this opinion.

Reversed and remanded with directions.